**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | No. **0102 1:24CR00117-1** |
| ) | |
| MENGYING JIANG, ) | |
| Defendant. ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**
**AND REQUEST FOR NON-GUIDELINE SENTENCE**

The Defendant, **Mengying Jiang**, ("Jiang"), submits this memorandum in support of his request for a non-Guideline sentence of twenty-four (24) months within the acceptable range of twenty-four (24) to thirty (30) months. Jiang also requests that the Court waive all fines.

### I.   Sentencing Framework

A sentencing court's approach to sentencing is well-established. Following United States v. Booker, 543 U.S. 220 (2005), the United States Sentencing Guidelines are no longer mandatory but, rather, advisory. The Guidelines are but one of the factors to consider in crafting an appropriate sentence. Sentences are to be crafted with the primary sentencing mandate of 18 U.S.C. § 3553(a) in mind, which states that courts must impose the minimally-sufficient sentence to achieve the statutory purposes of punishment—justice, deterrence, incapacitation, and rehabilitation. That is:

> The court shall impose a sentence *sufficient, but not greater than necessary,* to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]. 18 U.S.C. § 3553(a) (emphasis added).

1

The sentencing court should "consider every convicted person as an individual and every case as an unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Gall v. United States, 552 U.S. 38, 52 (2007).

After calculating the Guidelines sentencing range, the sentencing court should consider the factors of 18 U.S.C. § 3553(a) in determining an appropriate sentence. Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the need for the sentence imposed, (3) the kinds of sentences available, (4) any relevant policy statement issued by the Sentencing Commission, (5) the need to avoid unwarranted sentencing disparity, and (6) the need to provide restitution. 18 U.S.C. § 3553(a); Gall, 552 U.S. at 50 n.6.

The § 3553 factors, however, should not be considered a limitation on a sentencing judge's ability to consider facts and circumstances that do not fit neatly into the enumerated factors. A sentencing court may consider any circumstance that bears on the overarching principle that courts must craft sentences that are "sufficient, but not greater than necessary." Id.

## II.    Guidelines Calculations and Objections

Jiang suggests that his advisory Guideline Total Offense Level is 20, not 30 as was alleged in the Presentence Report ("PSR"). Jiang agrees with the PSR that the base offense level for this offense is 7 and that the loss amount attributable to Jiang is

$3,000,000 with a corresponding increase of 16 levels.[1]

### A. Objection to the Two-Level Enhancement for an Offense Involving Ten or More Victims.

Jiang objects to the two-level enhancement under §2B1.1(b)(2) for an offense involving ten or more victims. PSR ¶53. The Government must identify ten or more victims of Jiang, specifically, but has not done so. Jiang proposes that there are only three victims—Wal-Mart, Apple, and Target—whose loss may be attributed to him personally. The other potential victims mentioned in the PSR whose gift cards were compromised cannot be connected to Jiang more closely than to any other member of the cell.

The PSR identified a victim in Spokane, WA, a victim in Murphysboro, IL, a victim in Vancouver, WA, as well as four business entities—Staples, Wal-Mart, Apple, and Target. PSR ¶17, 20, 28 and 40. The Government has only specifically identified in total seven victims, not ten or more. The PSR indicates that gift card information for the victims in Spokane, WA, Murphysboro, IL, and Vancouver, WA, was distributed in WeChat threads that included Jiang, Wu, and Mingdong Chen. PSR ¶28. No discovery provided by the Government indicates that Jiang himself utilized that information as opposed to Wu, Chen, or other unidentified members of the WeChat thread. No discovery has indicated that Jiang himself stole those numbers, nor that Jiang himself used them to fraudulently purchase electronics.

The Government has not provided any discovery to indicate that Jiang was

---

[1] The loss amount is "complex in light of the involvement of a myriad of gift card transactions over multiple years and the contemporaneous operation of similar cells in New Hampshire during that time period." *See* PSR ¶52.

connected specifically to the conduct involving Staples. According to the PSR, Chinese hackers gained access to Staples' systems via a "heap dump," a hacking technique that allowed them to mimic the login accounts of Staples' employees. PSR ¶10-15. Jiang did not participate in this hack, nor was he even aware that it happened. Undersigned seems to recall the Government agreeing that Jiang was not involved in the Staples hack. Furthermore, there is no evidence provided in discovery that Jiang conducted any "romance schemes."

Concerning the corporate victims, courts have held that different branches of the same corporation do not constitute different victims for the purposes of §2B1.1(b)(2). For example, in United States v. Icaza, 492 F.3d 967 (8th Cir. 2007) the Eight Circuit Court of Appeals vacated the sentences of the three appellants and remanded to the district court because the district court had treated different Walgreens branches as different victims under the Sentencing Guidelines instead of one corporate victim. United States v. Icaza, 492 F.3d 967, 969 (8th Cir. 2007). In Icaza the Court held that the Sentencing Guidelines had been erroneously applied when the district court counted 407 branches of Walgreens as different victims instead of one, corporate victim. Id at 970.

The branches of Wal-Mart, and of any other corporate entity e.g. Staples, Apple, and Target, should be considered as one, corporate victim for the purposes of the Sentencing Guidelines as applied by federal courts such as in Icaza. As such, assuming arguendo that Jiang's victims do, in fact, include the three persons listed in the PSR, and include the four corporate entities, then the total victims are seven, not ten.

4

The PSR speculates, "It more likely than not, and fairly certain, there were at least another four victims." PSR ¶53. The PSR continues that the victims "included Staples, Apple, and numerous victims of romance schemes, elder fraud, and gift card theft, including the four described above (see paragraph 28)." Id. This Honorable Court should not rely on this speculation but only on the verifiable evidence presented, which indicates that Jiang's victims are only three—Apple, Target, and Wal-Mart.

### B. Objection to the Two-Level Enhancement for an Offense Committed with Sophisticated Means and in Substantial Part from Outside the United States.

Jiang objects to the two-level enhancement under §2B1.1(b)(10)(b) for an offense committed with sophisticated means and "committed [in substantial part] from outside the United States." PSR ¶54. "The [sophisticated means] enhancement requires some means of execution that separates the offense...from the ordinary or generic." United States v. Jinwright, 683 F.3d 471, 486 (4th Cir. 2012).

Jiang's involvement in this scheme was not sophisticated at all. He took gift cards from stores, wrote down the numbers, and returned them. He bought fraudulent gift cards at a discount and used them to buy electronics. These actions are not sophisticated, but the actions of a low-level conspirator.

The scheme viewed as a whole may be sophisticated, but that sophistication was not at Jiang's level. Rather any sophistication present was at the level of the "organized criminal elements in China" who conducted the alleged Staples hack and apparently manage innumerable, unrelated Chinese cells. Jiang's part in this scheme—purchasing electronics with stolen gift cards, sending them to a

warehouse—was simple and unsophisticated.

Courts have ruled on the question of what level of financial fraud may be considered sophisticated. For example, in United States v. Adepoju, 756 F.3d 250 (4th Cir. 2014) the Fourth Circuit Court of Appeals considered the case of a defendant who forged checks and social security cards in order to defraud banks. The Court ruled that the sophisticated means enhancement should not apply, stating, "The enhancement for sophisticated means does require more than just thoughtful or potentially successful planning...the presence of forgeries or stolen identification, and a plan to use such material to wrongfully acquire moneys, does not necessarily amount to sophistication." Id at 259. Jiang's mere possession and use of stolen gift cards was not sophisticated in the slightest.

Furthermore, Jiang's activity was conducted entirely within the United States. He entered the country in 2014 and never returned to China. Every action taken by Jiang occurred in the United States. The standard that a "substantial part of a fraudulent scheme was committed from outside the United States" should not apply to Jiang. Jiang did not participate and was unaware of the Staples hack. Jiang never even knew the identities of those Chinese who sold him the discounted gift cards over WeChat. It is suspected that parts of this scheme were committed in China, but Jiang's part of it was committed entirely in the United States.

### C. Objection to the Four-Level Enhancement as an Organizer, Leader, Manager, or Supervisor of Criminal Activity with Five or More Participants.

Jiang objects to the four-level enhancement §3B1.1(a) as an organizer or

6

leader of the criminal activity with five or more participants. PSR ¶57. To apply this enhancement there should be at least five participants. The Government has not identified five participants associated with Jiang.

The PSR identifies co-defendants as "none" and two related cases—Naxin Wu, docket #: **0102 24-CR-00113-LM-01**, and Mingdong Chen, docket #: **0102 24-CR-00116-JL-01**. PSR ¶6. The PSR also references four Asian men caught on surveillance footage standing in line and conducting multiple transactions with gift cards. PSR ¶17. These four were Jiang, Mingdong Chen, Xiang Zhong Chen, and a fourth unidentified Asian man. PSR ¶18. Finally the PSR mentions Jinbin Ren, who operated a warehouse that stored and shipped fraudulently obtained goods. PSR ¶29.

The only information provided in the PSR to connect the random unidentified Asian man to Jiang is that he was in line behind him at Target when the Defendant used stolen gift cards. PSR ¶18. There was no evidence presented to indicate that the Defendant ever communicated with this unidentified Asian man. Surely, the fact that the man is Asian—possibly Chinese—is not enough to label him as a participant.

In order to be counted as a participant for the purposes of the Sentencing Guidelines, a person must be "(i) aware of the criminal objective, and (ii) knowingly offer[ed] his assistance." United States v. Anthony, 280 F.3d 694, 698 (6th Cir. 2002) (internal citations omitted). An unidentified Chinese man standing in line behind Jiang at Target, who may have used a stolen gift card, who cannot now be located or even identified, cannot be considered a participant in Jiang's scheme. The PSR itself references that there were many unrelated cells in operation throughout New Hampshire. PSR ¶47, 52. There is simply no evidence that this unidentified Asian man

7

was aware of Jiang's criminal objective and knowingly offered his assistance. It is highly probable that this Asian man was a participant in an unrelated cell or was simply an innocent bystander in line who unwittingly used stolen gift cards.

An unwitting person is not a participant, even if the person assisted the criminal enterprise, because he or she ordinarily bears no criminal responsibility. *See* United States v. McCoy, 242 F.3d 399, 410 (D.C. Cir. 2001); *see also* United States v. Harvey, 532 F.3d 326, 338 (4th Cir. 2008) ("'Participants' are persons involved in the activity who are criminally responsible, not innocent bystanders used in the furtherance of the illegal activity."). The Government has not presented any evidence that this unidentified Asian man is anything other than an unwitting person at best.

Similarly, the Government also has presented no evidence to show that Xiang Zhong Chen is a participant. Xiang Zhong Chen may himself have been an unwitting person or a member of an unrelated cell. Xiang Zhong Chen is not listed as a co-defendant nor is he listed as a charged person under "related cases." There is no evidence presented to suggest that Xiang Zhong Chen was a member of Jiang's cell, if he was a participant at all.

The Government has presented no evidence that Jinbin Ren was a member of Jiang's cell. Information provided in discovery indicates that Ren operated a warehouse that stored goods before shipping them to China. PSR ¶29. Ren indicated that he had multiple clients, including apparently multiple Chinese cells located in the United States. Id. Discovery provided by the Government did not indicate that Ren was a member of any particular cell. Ren apparently was not charged as a "related case."

Finally, the Government has not presented any evidence that Jiang was an organizer, leader, or manager in this scheme as contemplated for the Sentencing Guidelines. No

8

evidence provided in discovery indicated any allegation from Mingdong Chen that he had been recruited by Jiang. Nor has any evidence been provided beyond mere assertion to indicate that Jiang recruited or managed Wu, Xiang Zhong Chen, or anyone else.

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. USSG §3B1.1, comment (n.4).

Jiang was never referred to in discovery as a "kingpin" or "boss" by any of the other participants alleged by the Government to have been a part of his cell. There is no evidence provided by the Government that indicates that Jiang made decisions for his cell. Instead, Jiang, Wu, and Mingdong Chen carried out orders from their superiors in China— superiors whose identities were unknown to them.

There is no evidence provided by the Government that indicates that Jiang was responsible for recruitment of his accomplices. Jiang claimed that an acquaintance of his had introduced him to a WeChat thread where gift cards could be purchased at an auction. PSR ¶39. Mingdong Chen did not even know Jiang's name. PSR ¶22. No mention was made of recruiting the other alleged members of his cell, nor was there any indication that any alleged members answered to Jiang as a superior, beyond bare assertion. PSR ¶57.

There is no evidence provided by the Government to indicate that Jiang received a

larger share of the fruits of this criminal scheme. A computer with gift card numbers was found in Jiang's apartment, indicating that Jiang was simply a record keeper. Ledgers with gift card numbers and payments show only that he kept records. They no more indicate that he was the leader or organizer of his cell than such records in the hands of an accountant would indicate that the accountant is the "leader" or "organizer" of a company.

Jiang's cell was in large part delivering electronics to Ren's warehouse. They personally received minimal profit. When Jiang was arrested, he was living in a small, nondescript apartment in Nashua, NH that he shared with Naxin Wu. Jiang did not live a life beyond his means or flaunt any stolen wealth. He was found indigent in Merrimack Superior Court.

There is no evidence provided by the Government that Jiang had a larger degree of participation in planning or organizing the offense than anyone else alleged to have been involved. Jiang himself said he was recruited into a pre-existing scheme over WeChat. PSR ¶39. Jiang did not plan or organize this offense. In fact, he allegedly did not even realize at first that his conduct was illegal. PSR ¶44. Once participating, however, no evidence provided in discovery indicates that Jiang's degree of participation was larger than anyone else's in this cell.

In summary, there is no evidence provided by the Government to indicate that Jiang exercised any degree of control or authority over the other alleged members of his cell. The Government has not provided any evidence in discovery to suggest that Jiang had authority over Mingdong Chen or Naxin Wu, who are the only related defendants. Furthermore, no evidence indicates that Jiang exercised any degree of control or authority over Xiang Zhong Chen, Jinbin Ren, or the unidentified Chinese man in the line behind him

at Target. Jiang was not a organizer, leader, manager, or supervisor, so this enhancement should not apply under the Guidelines.

### III.     Request for Downward Departure

Jiang requests a Zero-Point First-Time Offender Adjustment under §4C1.1. Defendants qualify for a Zero-Point First-Time Offender Adjustment and may have their offense level reduced by two levels if:

> (1) the defendant did not receive any criminal history points from Chapter Four, Part A; (2) the defendant did not receive an adjustment under §3A1.4 (Terrorism);
> (3) the defendant did not use violence or credible threats of violence in connection with the offense;
> (4) the offense did not result in death or serious bodily injury;
> (5) the instant offense of conviction is not a sex offense;
> (6) the defendant did not personally cause substantial financial hardship;
> (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
> (8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);
> (9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense);
> (10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role); and
> (11) the defendant was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848. §4C1.1.(a).

The nature of the allegations against Jiang suggests that only adjustments (6), (10), or (11) could prevent him from receiving the Zero-Point First-Time Offender Reduction. These adjustments do not apply to Jiang.

### a) <u>Objection to Adjustment (6), Substantial Financial Hardship.</u>

Adjustment (6) refers to substantial financial hardship. The Sentencing

11

Guidelines refer to Application Note 4(F) of the Commentary to §2B1.1 (Theft,

Property as a definition of "substantial financial hardship." §4C1.1(b)(3).

> In determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim—
> (i) becoming insolvent;
> (ii) filing for bankruptcy under the Bankruptcy Code (title 11, United States Code);
> (iii) suffering substantial loss of a retirement, education, or other savings or investment fund;
> (iv) making substantial changes to his or her employment, such as postponing his or her retirement plans;
> (v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and
> (vi) suffering substantial harm to his or her ability to obtain credit.

No such allegations have been made against Jiang concerning any of his

alleged victims. Despite the financial nature of this scheme, no victims suffered

substantial financial hardship according to the Sentencing Guidelines.

### b. Objection to Adjustment (10), Aggravating Role.

Concerning Adjustment (10), Jiang reiterates that he did not have an

aggravating role—he was not a leader, organizer, manager, or supervisor in this

scheme.

### c. Objection to Adjustment (11), Continuing Criminal Enterprise.

Concerning Adjustment (11), Jiang was not engaged in a continuing criminal

enterprise as defined in 21 U.S.C. § 848. A person is engaged in a criminal enterprise

if:

> **(1)** he violates any provision of this subchapter or subchapter II the punishment for which is a felony, and
> **(2)** such violation is a part of a continuing series of violations of this subchapter or subchapter II—
> **(A)** which are undertaken by such person in concert with five or more

12

other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

**(B)** from which such person obtains substantial income or resources. 21 U.S.C. § 848(c).

Jiang was not charged under 21 U.S.C. § 848. Regardless, Jiang reiterates that he did not occupy a position of organizer, supervisory position, or any other position of management, nor did he supervise five or more persons. He was a low-level member of one of many Chinese cells controlled from supervisors located in China. He did not invent this scheme, he played a relatively minor role, and he did not manage the other alleged members of his own cell. Jiang did not obtain a substantial income or resources—the $3,000,000 loss figure reflects the value of electronics which were obtained by Jiang and others and delivered to Ren's warehouse. It does not reflect in any sense Jiang's personal income at all. "This language [of upward adjustments in the Sentencing Guidelines] is designed to reach the 'top brass' in the drug rings, not the lieutenants and foot soldiers." Richardson v. United States, 526 U.S. 813, 829 (1999) (internal citations omitted). Jiang was a foot soldier, nothing more.

    **IV.**   ██████████████████████████████.

██████████████████████████████████████████

████████████████████

    **V.**   **Suggested Offense Level Computation.**

Jiang suggests that his Offense Level Computation under the Sentencing Guidelines is 20 with a Criminal History Category of I, which is a range of 33-41

months. █████████████████████████████████████████████

██████. This calculation is reached in the following manner:

**Base Offense Level:** +7, because the offense of conviction has a statutory maximum

term of imprisonment of 20 years or more. USSG § 2B1.1(a)(1).

**Specific Offense Characteristics:** +16, because the loss is more than $1.5 million

but not more than $3.5 million. USSG §2B1.1(b)(1)(I).

**Specific Offense Characteristics:** +2, because Jiang trafficked gift cards, which are

considered unauthorized access devices. USSG §2B1.1(b)(11)(B)(i).

**Acceptance of Responsibility:** -2, because Jiang accepted responsibility and has

admitted his guilt. USSG §3E1.1(a).

███████████████████████████████████████████████

███████████████████████████████████ ▬

**Zero-Point First-Time Offender Reduction:** -2, because Jiang has no criminal

history and is not prohibited by any exclusions under the Guidelines. USSG

§4C1.1(a).

**Subtotal:** +20.

## VI.   Request for Variance for Section 3553(a) Factors.

Jiang states that, upon consideration of the factors set forth in 18 U.S.C.

§3553(a), a sentence of twenty-four months is sufficient, but not greater than

necessary to accomplish the goals of sentencing.[2] Jiang requests a variance from

---

[2] The purpose of sentencing is to:

> (A) to reflect the seriousness of the offense, to promote respect for the
> law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;

the Sentencing Guidelines based on the Section 3553(a) factors present in his case.

### A. <u>Variances.</u>

According to <u>United States v. Booker</u>, 543 U.S. 220 (2005), the U.S. Sentencing

Guidelines have become advisory rather than mandatory. District courts begin by

calculating the guideline range but may vary from that range based on the

sentencing factors in 18 U.S.C. § 3553(a). A variance is not limited to specific

criteria in the Guidelines and permits the Court to impose a sentence based on

factors in 18 U.S.C. § 3553(a). The Court should impose a sentence that is

"sufficient, but not greater than necessary, to comply with the purposes set forth in

paragraph (2) of this subsection." 18 U.S.C. § 3553(a). These factors include:

> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
> **(2)** the need for the sentence imposed—
>> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> **(B)** to afford adequate deterrence to criminal conduct;
>> **(C)** to protect the public from further crimes of the defendant; and
>> **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> **(3)** the kinds of sentences available;
> **(4)** the kinds of sentence and the sentencing range established for—
>> **(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—
>>> **(i)** issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines

---

> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 USCS § 3553(a)(2).

> by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
>
> **(ii)** that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or...

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### B. <u>Nature and Circumstances of the Offense.</u>

Jiang reiterates that he was not a leader, organizer, manager, or supervisor in this criminal scheme, there were fewer than ten victims, and that there were fewer than five or more participants for the purposes of calculations under the Guidelines.

The Guidelines are a starting point in every sentencing determination, but "courts may vary [from the Guidelines] based solely on policy considerations, including disagreements with the Guidelines." <u>Kimbrough v. United States</u>, 552 U.S. 85, 101 (2007) (internal citations and quotations omitted). Concerning the fraud sections of the Guidelines, several courts have questioned an over-reliance on loss in determining an appropriate sentence.

For example, in <u>United States v. Prosperi</u>, 686 F.3d 32 (1st Cir. 2012), the First Circuit affirmed a sentence of six months home confinement where the Guidelines range was 87 to 108 months. <u>Id</u>. at 34. There, the defendants were employed by a subcontractor of Boston's Central Artery/Tunnel project, more commonly referred to as the "Big Dig". <u>Id</u>. at 34. The defendants were convicted of falsifying documents concerning the quality of concrete used in that project. <u>Id</u>. The district court found that loss amount was "an unfair proxy for culpability." <u>Id</u>. at 44. The Court approved

16

of the sentencing judge's consideration of the specifics of the case and the defendant's conduct instead of relying on the loss calculation. Id.

In United States v. Algahaim, 842 F.3d 796 (2nd Cir. 2016), the Second Circuit noted the low base offense level (Level 6 in that case) that the Sentencing Commission chose as a starting point for these types of offenses. "Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." Id. at 800. The Court noted that using loss to increase a sentencing range was "unknown to other sentencing systems" and was appropriate for a sentencing court to consider in determining a fair sentence. Id. The Court remanded for resentencing so that the district court could "consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence." Id.

The nature and circumstances of this case are a good example to indicate that the Guidelines loss calculation is not a good proxy for culpability. Although the total loss amount in this case was $3,000,000, that figure does not represent the amount that Jiang personally profited from this offense. Rather, that figure represents the total value of electronics that were obtained by Jiang, Wu, and Mingdong Chen, electronics which were delivered to Ren's warehouse for shipment.

Jiang barely profited at all. He lived in a small apartment in Nashua with Naxin Wu. Mingdong Chen was living out of his car. When police searched Jiang's apartment they noted the goods waiting to be shipped, but they did not note any

17

signs of wealth or "ill-gotten gains." Jiang had not purchased expensive amenities for his own enjoyment. He did not live in luxury. Whatever personal benefit he received was barely enough to eke out a low standard of living. The PSR notes that Jiang visited Mohegan Sun every few months and gambled the relatively low sum of $1,000. PSR ¶82. Jiang owned no property, had no significant investments or bank accounts, and Merrimack Superior Court found him indigent for his New Hampshire criminal case, docket #: **217-2024-CR-00207**, which charged in state court the same criminal conduct as alleged here.

Jiang acted at a low level in one of many unrelated Chinese cells. The electronics he obtained were delivered to a warehouse. No evidence provided in discovery indicates that Jiang kept these electronics for his own personal use. Yet the single largest enhancement under the Sentencing Guidelines is the loss enhancement, which is +16 based on the loss of $3,000,000. While Jiang does not contest the accuracy of the loss estimate, Jiang does ask this Honorable Court to exercise its discretion to determine an appropriate sentence, which this Honorable Court is at liberty to do, and calculate the Guidelines as Jiang has suggested and find that the appropriate range is twenty-four (24) to thirty (30) months, and impose a non-Guidelines sentence of twenty-four (24) months.

### C. **Jiang's History and Characteristics.**

On June 29, 1990, Mengying Jiang was born in Lian Jiang, China, a rural area. His parents got divorced when he was five years old and Jiang went to live with his grandparents. Jiang's father visited him once a year. His mother visited him twice a year. Jiang's grandfather was a fisherman and a diabetic in extremely poor health.

Jiang's grandmother and aunt were also in poor health and growing up his family had almost no money at all due to their medical expenses. Jiang was bullied for being poor and not having anything to eat at school lunches.

Jiang got good grades in elementary school, but his grades began to suffer in middle school. Jiang dropped out of high school and began taking odd jobs to supplement his grandfather's income. He was regularly paid not with money but with food.

Jiang began attending a Chinese underground church when he reached adulthood. In China, however, only three churches are legal—the Chinese Catholic Patriotic Association, the China Christian Council, and the Three-Self Patriotic Movement.[3] The consequences of attending a Chinese underground church are severe and Jiang was arrested. He fled to Mexico with the aid of a Chinese underground church and crossed the border, receiving asylum and a green card due to the threat of punishment awaiting him in China.

Jiang found employment in Chinese restaurants in New York, Massachusetts, New Jersey, Florida, and Virginia. He sent most of what he earned back to his grandfather, whose health continued to deteriorate. However, he received fewer and fewer hours at the restaurants, eventually becoming unemployed.

Jiang was introduced into WeChat groups by an acquaintance while living in New York City with his girlfriend, Naxin Wu. PSR ¶39. Due to his severe financial difficulties, Jiang was receptive to the financial opportunity that seemed to be

---

[3] 4. Christianity, Pew Research Center, (August 30, 2023)
https://www.pewresearch.org/religion/2023/08/30/christianity/.

available and began engaging in the conduct which led to this case.

Jiang's grandfather passed away in 2024 due to complications from diabetes. Jiang has no wife and no children. He lived with his girlfriend, Naxin Wu, who is a related defendant in this case.

A twenty-four (24) month sentence is a sentence that is sufficient but not greater than necessary for the purposes of sentencing. There is no reason to believe that anyone involved—Jiang, his victims, the Government—will benefit from a harsher sentence than twenty-four (24) months. Jiang is penniless. At the conclusion of his sentence, he faces certain deportation to China, and likely prosecution for attending a Chinese underground church. The only family who ever cared for Jiang is gone. Jiang has led a difficult life, abandoned by his parents, impoverished, targeted by his native government for his faith, adrift in a strange country, and manipulated by organized criminal elements in China. He faces a lengthy prison sentence, followed by certain further punishment in China. This Honorable Court may be assured that justice, deterrence, incapacitation, and rehabilitation in this case will be sufficient with this proposed sentence.

### D. The Need for the Sentence Imposed.

Jiang suggested sentence of twenty-four (24) months reflects the seriousness of the offense and the criminal conduct to which he admits. This sentence promotes respect for the law and is a just punishment that adequately deters further criminal conduct both on Jiang's part and on the part of other unidentified members of Chinese cells still active and present in the United States.

Jiang faces imminent deportation to China at the end of his sentence. The

20

American public may be assured of complete and effective protection from further crimes—Jiang will never be permitted to return to the United States.

## E.  The Need to Avoid Unwanted Sentencing Disparities.

Naxin Wu sentenced for Conspiracy to Commit Wire Fraud to thirty-three (33) months imprisonment. PSR ¶6. Mingdong Chen's sentencing is pending. Id. The requested sentence for Jiang is not unduly disparate.

## F.  Restitution.

Jiang is destitute and has no ability to pay restitution. He has, however, consented to the forfeiture of electronics seized at his Nashua apartment, which the Government will presumably apply to benefit the victims in this matter.

## G.  Request to waive all fines.

The parties have agreed in the plea agreement to request a waiver of all fines in this case. Jiang has consented to forfeiture of the significant number of electronics seized at his Nashua apartment along with three checks totaling $29,463. Jiang has no other money and cannot pay any fines. As such, Jiang requests that this Honorable Court waive all fines in this matter.

## H.  Credit for Prior Custody.

"A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences." 18 U.S.C. § 3585(b). According to Merrimack County House of Corrections, as of the date of Jiang's sentencing hearing, April 22, 2025, he has been in custody for four hundred and thirteen (413) days. As such, he is entitled to four hundred and thirteen (413) days of pretrial confinement credit.

21

**CONCLUSION**

For the foregoing reasons, Jiang respectfully requests that the Court:

1. Calculate the Guidelines as Jiang has recommended and apply a variance to impose a sentence of twenty-four (24) months imprisonment; and

2. Waive all fines and interest;

**Mengying Jiang**
By his attorney,

Date: April 11, 2025

/s/Olivier Sakellarios
Olivier Sakellarios, Esq.
US Bar #:
Sakellarios Legal
195 Elm St.
Manchester, New Hampshire 03101
603-669-1663
Ods142@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Date: April 11, 2025

/s/Olivier Sakellarios
Olivier Sakellarios, Esq.

22